## THE E. V. McCAULLEY.

## THE IVANHOE.

(Circuit Court of Appeals, Third Circuit.   December 2, 1898.)

1. TOWAGE—LOSS OF TOW—NEGLIGENCE OF TUG—RELIANCE ON WEATHER SIGNALS.

The captains of tugs who remained in harbor with their tow during a storm lasting several days were not negligent in relying on the government weather signals, and putting to sea after the storm had abated and the signals had been changed to indicate fair weather and favorable winds, merely because the wind had "backed around" from the northeast to west of north.

2. SAME—INSUFFICIENCY OF HAWSER.

Tugs engaged in towing a dock at sea cannot be held liable for its loss during a storm, on the ground of the insufficient strength of the hawser used, where it appears the loss is in no way attributable thereto.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

This was a libel by Rilatt Bros. against the tugs E. V. McCaulley and Ivanhoe for the loss of a tow.   The district court dismissed the libel (84 Fed. 500), and the libelants appeal.

Edward F. Pugh and Henry Flanders, for appellants.

John F. Lewis, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and KIRKPATRICK, District Judge.

KIRKPATRICK, District Judge.   The tugboats E. V. McCaulley and Ivanhoe were employed to tow a dock belonging to the libelants from the port of New York to Philadelphia.   The dock was to be prepared for the voyage by the owners, and when ready the tugs were to furnish the necessary hawser for the towing, and start upon the voyage at the first favorable opportunity.   The tugs reached New York on Monday, October 28th.   On the following day an easterly storm set in, which continued until early Friday morning, when the weather cleared and the wind went to the northwest.   About 11 o'clock Friday morning the tugs started with the dock in tow, and on Saturday, about 10 o'clock in the morning, when off Barnegat light, the dock was lost in a storm.   The charge of the libelants is that the tugs are responsible for the loss, because it was entirely due to their carelessness or negligent conduct.   Three charges of negligence are urged upon our consideration,—the first relates to the commencement of the voyage, the second to its continuance, and the third to the improper means employed to do the towing.

As to the first charge, the libelants say that the tugs were guilty of negligence in taking the dock outside of the shelter of Sandy Hook when they did, because the indications at that time were that the weather was not "settled," and a recurrence of the storm was probable before the tow could reach its destination.   In support of this allegation they offer the testimony of Mr. Griffin, who says that the wind on Friday morning "backed around" from northeast to northwest, and

cite the case of The Vandercook, 65 Fed. 251, as an authority to establish the rule that this is an indication of the temporary nature of good weather. True it is that the court did say that, from the evidence produced in that case, it appeared "that when the wind backs from the northeast to westward of north it is likely to return to the eastward before many hours," but the Vandercook was held to be in fault, not from this circumstance alone, but because, before the start had been made, the wind was blowing from the eastward, and because other captains similarly situated with tows did not consider it a prudent thing to do. The evidence in the case at bar is that on Friday morning, when the tugs started with the dock, the weather had cleared, the sea was smooth, and the wind was blowing gently from the northeast. When the tugs and dock reached Sandy Hook, between 2 and 3 o'clock Friday afternoon, it was observed that the government weather signals had been changed; those predicting fair weather and winds favorable for vessels to leave port having been substituted for those telling of the probable continuance of the storm. Many vessels which had sought shelter in Princes Bay had proceeded or were proceeding upon their voyages, because, as the masters who were called as witnesses testified, they believed the storm had spent itself. Under these circumstances, we do not feel justified in finding the tugs guilty of carelessness, even though it be a fact that the wind "backed around" by the northward. The captains of the tugs had no interest in putting to sea in the face of a storm. They, no doubt, would have preferred a safe anchorage in the bay to the risk of encountering an easterly storm off the notoriously dangerous New Jersey coast. They may be presumed to have exercised their best judgment, which, when fortified by that of others in the like situation and confirmed by the predictions of those whom the government employs to gather information and give to seamen the benefit of their experience, is sufficient to relieve them from the charge of negligence. It is urged that the predictions of the government officials of the weather bureau are not to be relied upon; that they are so frequently incorrect as to make them the laughing stock of the observant and the weather-wise. It may be that a predicted storm may be dissipated before reaching its apparent destination, or that one may unannounced come from a quarter where stations of information are few or absolutely wanting, but nevertheless we are of the opinion that these reports furnish the most trustworthy information attainable, and that those relying upon them should not be considered negligent or careless, as might be those who suffered injury despite these warnings.

The second charge of negligence is that the tugs should have "put back," and not proceeded upon the voyage, when at sunset the indications were that a storm was threatening. The evidence fails to substantiate the allegation that at that time there were any such indications. It is denied by all the witnesses whose duty it was to observe the signs of the weather and by all the others called in the case, except Mr. Griffin, who says merely that the sunset "was not a good one." All the others say that at sunset there were no signs of storm, and that it was clear, the wind light and from the westward, the sea smooth, and that there was no reason to believe that the favorable weather would not continue until they reached the Capes. It was not until about

3 o'clock in the morning of Saturday, when off Barnegat, that the wind shifted to the eastward, and the sea, in consequence, began to rise. It was then too late to turn back. They were 12 hours from Sandy Hook, and it would have required twice that time to have returned against the rising head wind. They were then obliged to keep on their course. The only time a return was practicable was at sunset, and it was not then apparently necessary or advisable.

The third charge is that the tugs were negligent in not furnishing a proper hawser for the towing. Various witnesses have been called to testify respecting its sufficiency. It seems to us, however, that the unanswerable reply to libelants' contention of unfitness is that they have not shown that the loss of the dock was in any way attributable to the weakness of the hawser. Long before the hawser parted it was apparent that the dock could not withstand the violence of the gale. Griffin, the libelants' employé, testified that at daylight he believed that the dock was doomed to destruction. He was on the dock, and in a position to know its condition. The sides were swaying to and fro, and the sea was sweeping through it from end to end. So dangerous did he regard the situation that he was unwilling to remain longer on the dock. He signaled the tugs to come to his assistance, and, when it was found that the tug could not approach the dock on account of the violence of the waves, Griffin seized a rope thrown to him from the tug, lashed it around his body, and cast himself into the sea, preferring to take that desperate risk rather than remain upon the sinking dock. The hawser held for some time after Griffin left the dock, and until about half past 8 in the morning, when, by a sudden strain caused by the surging of the vessel, it parted at the bitts of the tug. The same high seas which rendered it impossible for the tugs to approach the dock to effect Griffin's rescue prevented them from recovering the tow, and soon afterwards the dock was broken to pieces by the waves and sunk. A careful consideration of the evidence satisfies us that the fate of the dock would have been the same had the hawser held until it would have been necessary to cut it to prevent the tug from following the dock to the bottom of the sea.

Upon the whole case, we fail to find that any of the charges of negligence are sustained by the proofs, and we are of the opinion that the decree of the district court should be affirmed.